**Not for Publication**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BANK LEUMI USA,<br><br>   *Plaintiff*,<br><br> v.<br><br>EDWARD J. KLOSS and KLOSS COMPANY, LLC (d/b/a CRIB & TEEN CITY),<br><br>   *Defendants*. | Civil Action No. 17-7729 (EP) (AME)<br><br>**OPINION** |

**PADIN, District Judge.**

  This action stems from non-party Munire Furniture Company, Inc.'s ("Munire") default on $17 million loaned to it by Plaintiff Bank Leumi USA (the "Bank").[1] The Bank claims that its losses on that loan presently stand at $8,512,713.22. D.E. 64 ¶ 75. It is now attempting to recover $2.65 million of those losses from Defendants Edward J. Kloss and his company, Kloss Company LLC d/b/a Crib & Teen City (hereinafter, "Crib & Teen City"), who are also Munire creditors.

  Currently pending before the Court is the Bank's motion for partial summary judgment, brought pursuant to Federal Rule of Civil Procedure 56. D.E.s 62-68. The Bank requests that the Court find, as a matter of law: (1) that Kloss owes it $675,000 based on his alleged breach of a March 11, 2009 Subordination Agreement which the Bank required Kloss to sign as a condition of it agreeing to loan an initial $15 million to Munire; and (2) that Kloss and Crib & Teen City owe the Bank an additional $2 million – *i.e.*, the entire sum which the Bank agreed to lend to

---

[1] Valley National Bank is the successor-by-merger of Bank Leumi USA, and is the entity now pursuing this lawsuit.

Munire on November 12, 2013, after Munire had already spent nearly all of the $15 million which the Bank originally loaned to it – under a fraud in the inducement theory based on Kloss's November 15, 2013 execution of a document titled Ratification and Reaffirmation of Subordination Agreement. Defendants oppose the Bank's motion. *See* D.E.s 70-72. The Court has considered the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L.Civ.R. 78.1(b). For the following reasons, the Bank's motion for partial summary judgment is **DENIED**.

I. BACKGROUND

A. Factual Background

In early-2011, Munire approached the Bank seeking a $15 million revolving loan. D.E. 64 ¶ 1. During the underwriting process for approving for the loan, Munire disclosed that it owed Kloss $1.5 million. *Id.* ¶ 5. Kloss, at that time, was the proprietor of Crib & Teen City, a chain of children's furniture stores. *Id.* ¶ 6. Crib & Teen City sold, among its products, Munire-produced furniture. *See id.* ¶ 16.

The Bank advised Munire that as a condition to approving the $15 million loan, Munire and Kloss would be required to execute a Subordination Agreement by which Munire and Kloss would acknowledge that Munire owed Kloss $1.5 million, and Kloss would agree to subordinate that indebtedness to the debt Munire owed to the Bank. *Id.* ¶ 8.

The Subordination Agreement was executed by all parties on March 9, 2011. D.E. 65-4. It lists Kloss as the "Creditor." *Id.* It lists Munire as the "Debtor." *Id.* And it defines "Liabilities" as all of the Debtor's, *i.e.*, Munire's, "obligations to the Bank." *See id.* ¶ 1.

Section 1 of the Subordination Agreement states:

> All claims and demands, and all interest heretofore or hereafter accrued thereon, which [Kloss] now has or may hereafter have or acquire against [Munire] . . . shall not be paid, and no payment on account thereof, nor any security interest therein, shall be created,

> received, accepted or retained . . . unless and until [Munire] has paid
> and satisfied in full all of its obligations to the Bank . . . .

*Id.*

In Section 2, Kloss and Munire affirmatively represent that Munire's debt to Kloss totaled "$1,500,000.00 plus interest (at an annual rate of 10%) and no more." *Id.* ¶ 2.

Section 3 sets forth the consequences for a breach of the Subordination Agreement: "In the event of a breach by either [Munire] or [Kloss] in the performance of any of the terms of this agreement, or if any representation or warranty of [Munire] or [Kloss] hereunder shall prove to be materially false, all of the Liabilities[, *i.e.*, all of Munire's 'obligations to the Bank,'] shall, without notice or demand, become immediately due and payable." *Id.* ¶ 3.

Section 6 states that "[Munire] and [Kloss] agree to pay the Bank, on demand, all expenses of any kind, including reasonable counsel fees, which the Bank may incur in enforcing any of its rights hereunder, or defending or prosecuting any action related to transactions with the undersigned." *Id.* ¶ 6.

In the months after the parties executed the Subordination Agreement, Kloss continued to collect monthly interest payments on his $1.5 million loan. D.E. 64 ¶ 15. But these interest payments were not made in cash. Instead, Munire credited Kloss's company, Crib & Teen City, for money that Crib & Teen City owed to Munire for its purchases Munire-manufactured furniture which Crib & Teen City thereafter sold to retail customers. *Id.* ¶ 16. Between March 2011 and October 2013, Kloss received $400,000 in this form of credit-as-interest payments on his $1.5 million loan to Munire. *Id.* ¶ 29.

By November 2013, Munire had almost fully expended its available $15 million in Bank-issued credit and its balance stood at $14,940,000. *Id.* ¶ 30. Munire, at that time, requested that the Bank loan it an additional $2 million. *Id.* ¶ 31. The Bank granted Munire's request on

November 12, 2013. *See id.* ¶ 32 ("On or about November 12, 2013, the Bank and Munire entered into an [amended credit agreement] which increased the revolving line of credit available to Munire from $15 million to $17 million."). On November 13, 2013, with its credit line increased by $2 million to $17 million, Munire drew down $1.5 million. *Id.* ¶ 55. Munire drew down the remaining $500,000 two days later, on November 15, 2013. *Id.* ¶ 56.

On November 15, 2013, Kloss executed a Bank-issued document titled "Ratification and Reaffirmation of Subordination Agreement" (the "Reaffirmation Agreement"). D.E. 65-15; *accord* D.E. 64 ¶ 47. Under the Reaffirmation Agreement, Kloss agreed that the terms of the Subordination Agreement would remain in full force and effect. D.E. 65-15. Kloss further represented that "as of [November 15, 2013,] the aggregate outstanding principal amount [owed by Munire to Kloss was] $1,500,000." *Id.*; *accord* D.E. 64 ¶ 49. The Bank avers – without pointing to specific support in the record – that its approval of the supplemental $2 million loan to Munire was conditioned upon Kloss representing to the Bank that he had complied with the Subordination Agreement and reaffirming his commitment to continue so doing. D.E. 64 ¶ 33.

Between November 2013 and August 2014, Kloss collected a total of $275,000 in interest payments – again in the form of credits on the money Crib & Teen Furniture owed to Munire for its purchases of Munire-manufactured furniture – on Kloss's $1.5 million loan to Munire. *Id.* ¶ 61. From the time that Kloss executed the Subordination Agreement in March 2011 through and including August 2014, Kloss collected a total of $675,000 in credit-as-interest payments on his $1.5 million loan to Munire. *Id.* ¶ 62.

The Bank declared Munire in default on its $17 million loan in September 2014, and on September 18, 2014, the Bank commenced an action against Munire in the United States District Court for the District of New Jersey. *Id.* ¶ 67. Munire filed for bankruptcy on the following day,

4

September 19, 2014 (the "Munire Bankruptcy Action"). *Id.* ¶ 68. On November 3, 2014, Kloss and Crib & Teen City each filed a proof of claim in the Munire Bankruptcy Action. *Id.* ¶ 70. Kloss, in his proof of claim rider, noted that Munire owed him at least $1.5 million, and that interest payments on this loan "were made by providing Crib & Teen City with monthly credits against the amounts due by Crib & Teen City for merchandise purchased [from Munire]." *Id.* ¶ 71.

### B.  Procedural History

On June 30, 2022, the Bank filed its motion for partial summary judgment. D.E.s 62-66. It seeks summary judgment on its breach of contract claim against Kloss (Count I of its complaint) and on its fraudulent inducement claim against Kloss and Crib & Teen City (Count IV of its complaint). Defendants Kloss and Crib & Teen City filed opposition on August 25, 2022. D.E.s 70-72. The Bank submitted its reply on September 28, 2022. D.E.s 73-75.

## II.  LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate

the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III.   ANALYSIS

#### A. Summary Judgment on the Bank's Breach of Contract Claim is Denied

To establish a breach of contract claim, a claimant must show (1) "that the parties entered into a valid contract"; (2) "that the defendant failed to perform [its] obligations under the contract"; and (3) "that the plaintiff sustained damages as a result." *Murphy v. Implicito*, 392 N.J. Super. 245, 920 A.2d 678, 689 (App. Div. 2007). "A contract exists when there was a meeting of the

6

minds, there was an offer and acceptance, there was consideration, and there was certainty in the terms of the agreement." *See Allen-White v. Bloomingdale's, Inc.*, 225 F. Supp. 3d 254, 258 (D.N.J. 2016). A meeting of the minds "occurs when there has been a common understanding and mutual assent of all the terms of a contract." *See Knight v. New Eng. Mut. Life Ins. Co.*, 220 N.J. Super. 560 (App. Div. 1987).

"Generally, the terms of an agreement are to be given their plain and ordinary meaning." *M.J. Paquet, Inc. v. New Jersey Dep't of Transp.*, 794 A.2d 141, 152 (N.J. 2002). If the language of the contract is clear, the Court must enforce it as written. *CSFB 2001-CP-4 Princeton Park Corp. Ctr., LLC v. SB Rental I, LLC*, 980 A.2d 1, 4 (N.J. Super. Ct. App. Div. 2009). The Court cannot rewrite the parties' agreement by substituting a new or different provision from what is clearly written in the contract. *E. Brunswick Sewerage Auth. v. E. Mill Assocs., Inc.*, 838 A.2d 494, 497 (N.J. Super. Ct. App. Div. 2004).

If a contract is capable of being interpreted in more than one way, then it is ambiguous. "In deciding whether a contract is ambiguous, a court must hear the parties' interpretation of the contract and determine if there is any indication that the terms of the contract are susceptible to different meanings." *INDECS Corp. v. Claim DOC, LLC*, No. 16-4421, 2020 WL 5868796, at *9 (D.N.J. Oct. 2, 2020). Whether a contract is ambiguous is a legal question for the Court. *Id.* To make a finding of ambiguity, the Court may consider the contract language, the meanings suggested by counsel, and any extrinsic evidence offered in support of each interpretation. *Id.* "[W]here there is uncertainty, ambiguity or the need for parol evidence in aid of interpretation, then the doubtful provision should be left to the jury." *Great Atl. & Pac. Tea Co. v. Checchio*, 762 A.2d 1057, 1061 (N.J. Super. Ct. App. Div. 2000).

7

Here, the Bank correctly notes that under a reading of the plain language of the Subordination Agreement, Kloss agreed to forego collecting (and Munire agreed not to pay) any interest or principal on the $1.5 million Kloss loaned to Munire until Munire fully repaid the Bank on the $15 million it loaned to Munire. Indeed, Section 1 of the Subordination Agreement states:

> All claims and demands, and all interest heretofore or hereafter accrued thereon, which [Kloss] now has or may hereafter have or acquire against [Munire] . . . shall not be paid, and no payment on account thereof, nor any security interest therein, shall be created, received, accepted or retained . . . unless and until [Munire] has paid and satisfied in full all of its obligations to the Bank . . . .

D.E. 65-4 ¶ 1.

There is also no dispute that in the 32-month period following Kloss's execution of the Subordination Agreement, his company, Crib & Teen City, accepted $675,000 worth of credits for amounts it otherwise would have paid to Munire for furniture purchases, and that those credits represented interest payments on the $1.5 million loan Munire owed to Kloss. Indeed, Kloss affirmatively declared the same in his November 3, 2014 proof of claim in the Munire Bankruptcy Action. Kloss's acceptance of these credits breaches the clear terms of Section 1 of Subordination Agreement. The question then becomes what the appropriate remedy is in light of this breach.

The Bank avers that it is entitled to recoup $675,000 from Kloss. It argues that but for Kloss's unlawful collection of these credit-as-interest payments, the Bank's losses would be $675,000 less. D.E. 63 at 10. This does not mean, however, that the Bank, as a matter of law, is now entitled to recoup this sum from Kloss. That is because the plain language in Section 3 of the Subordination Agreement limits the Bank's remedies in a manner which would preclude such a finding. That provision reads: "In the event of a breach by either [Munire] or [Kloss] in the performance of any of the terms of this agreement . . . all of the Liabilities[, *i.e.*, all of *Munire's* 'obligations to the Bank,'] shall, without notice or demand, become immediately due and payable."

8

D.E. 65-4 ¶ 3. The plain language of this provision, in other words, appears to state that the Bank's sole remedy upon Munire or Kloss's breach of the Subordination Agreement is to require Munire, and that entity only, to immediately repay any sums its owed on the $15 million Bank loan. "In New Jersey, parties to a contract may agree to limit their liability as long as the limitation does not violate public policy." *Prof'l Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 167 (3d Cir. 2007); *accord CDK Glob., LLC v. Tulley Auto. Grp., Inc.*, 489 F. Supp. 3d 282, 314 (D.N.J. 2020) (finding that "damages would be limited pursuant to the limitation of liability clause found in the [contract,]" particularly because "both parties were sophisticated business entities and were in a position to fully understand all the provisions within"). Moreover, there is nothing in the plain language of Section 3 – or anywhere else in the Subordination Agreement – that unequivocally suggests that Kloss himself would be liable to the Bank for any losses it sustained as a result of Kloss's breach of the Subordination Agreement. The Court will not write better terms for the Bank than the ones included in the Subordination Agreement. *See Lucier v. Williams*, 366 N.J. Super. 485, 491, 841 A.2d 907, 911 (App. Div. 2004) ("We begin our analysis of the enforceability of the limitation of liability clause with the fundamental proposition that contracts will be enforced as written. Ordinarily, courts will not rewrite contracts to favor a party, for the purpose of giving that party a better bargain.") (citations omitted). For this reason, the Bank's motion for summary judgment on Count I of its complaint – and a resulting declaration that Kloss is liable to the Bank for $675,000 – is denied.

### B. Summary Judgment on the Bank's Fraudulent Inducement Claim is Denied

To establish a claim for fraudulent inducement, a claimant must establish the following: (1) a material representation of a presently existing or past fact; (2) made with knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that

party; (5) to his detriment." *RNC Sys., Inc. v. Mod. Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012). Here, the Bank claims that it was fraudulently induced by Kloss's November 15, 2013 execution of the Reaffirmation Agreement to extend an additional $2 million in credit to Munire, which Munire subsequently defaulted on. D.E. 63 at 14. The Bank avers that but for Kloss's execution of this document, it would not have loaned the additional $2 million to Munire. *Id.* It further claims that Kloss, in executing the document, falsely represented that he was not receiving interest payments from Munire on his $1.5 million dollar loan, and that this misrepresentation was material to the Bank's decision to loan an additional $2 million to Munire. *Id.* The Bank accordingly requests that the Court find, as a matter of law, that it is now entitled to recover the entirety of this $2 million sum from Kloss and his company, Crib & Teen City, under the theory of fraudulent inducement. The Court will not do so.

The Bank ignores that it undisputedly agreed to loan Munire an additional $2 million on November 12, 2013, which is three days *before* Kloss executed the Reaffirmation Agreement. *See* D.E. 64 ¶ 32 ("On or about November 12, 2013, the Bank and Munire entered into an [amended credit agreement] which increased the revolving line of credit available to Munire from $15 million to $17 million."); *id.* ¶ 47 (Bank acknowledging that Kloss executed Reaffirmation Agreement "[o]n or about November 15, 2013"); D.E. 65-15 (copy of Reaffirmation Agreement dated November 15, 2013). The record further shows that Munire withdrew $1.5 million of that sum two days *before* Kloss executed the Reaffirmation Agreement. Thus, the Court cannot find that the Bank even required that Kloss execute the Reaffirmation Agreement as a precondition of the $2 million loan, much less conclude, as a matter of law, that Kloss's execution of the same induced the Bank to lend $2 million to Munire. The Bank's motion seeking summary judgment on Count IV of its complaint – and a resulting declaration that Kloss and Crib & Teen City are liable to the

Bank for $2 million – is accordingly denied. *See Inventory Recovery Corp. v. Gabriel*, No. 2:11-CV-01604 (WJM), 2016 WL 1365995, at *4 (D.N.J. Apr. 6, 2016) (denying summary judgment on plaintiff's fraudulent inducement claims where "the extent to which Plaintiff relied on Defendants' misrepresentations is disputed").

### C. The Bank's Request for Attorneys' Fees is Denied

The Bank's request for attorneys' fees is also denied. Section 6 of the Subordination Agreement states that "[Munire] and [Kloss] agree to pay the Bank, on demand, all expenses of any kind, including reasonable counsel fees, which the Bank may incur in enforcing any of its rights hereunder, or defending or prosecuting any action related to transactions with the undersigned." D.E. 65-4 ¶ 6. The Bank avers that "*if* the Court grants summary judgment in favor of the Bank on either of its claims for breach of contract or fraud, it must also award the Bank its reasonable attorneys' fees and costs [under Section 6 of the Subordination Agreement]." D.E. 63 at 18 (emphasis added). Because the Bank's motion for partial summary judgment is denied, it is not entitled, at this juncture, to recoup expenses or attorneys' fees under the Subordination Agreement.

### IV. CONCLUSION

For the foregoing reasons, the Bank's motion for partial summary judgment, D.E. 62, is denied. An appropriate Order accompanies this Opinion.

Dated: January 13, 2023

*[signature]*
Evelyn Padin, U.S.D.J.